# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| BRETT COMBS, | Case No. 2:11-cv-00528-GMN-VCF |
| Petitioner, | **ORDER** |
| v. | |
| STATE OF NEVADA, et al., | |
| Respondents. | |

Before the court are petitioner's motion to conduct discovery and allow expansion of the record (ECF No. 113), petitioner's motion for evidentiary hearing (ECF No. 114), respondents' opposition to both motions (ECF No. 120), and petitioner's reply (ECF No. 122). The court denies both motions.

Also before the court are the amended petition for a writ of habeas corpus (ECF No. 23), respondents' answer (ECF No. 111), and petitioner's reply (ECF No. 112). The court finds that petitioner is not entitled to relief, and the court denies the amended petition.

**I.     Factual Background and Procedural History**

On November 17, 2008, petitioner robbed the Sorrel Sky Gallery in Durango, Colorado. He aimed a pistol at Julie Huffman, and employee of the gallery, and he emptied the cases of Ben Nighthorse jewelry. Ex. 30, at 53 (ECF No. 63-1, at 54). Barbara Longfellow, the manager, confirmed that each piece of jewelry that eventually was recovered had a value greater than

1

$2,500.00.  Id. at 70-82 (ECF No. 63-1, at 71-83).  On December 8, 2008, petitioner robbed the Rabbit Hole smoke shop, also in Durango.  He restrained Margaret Bannatyne, the owner, and took the shop's entire inventory, valued in excess of $2,500.00.  Id., at 104-15 (ECF No. 63-1, at 105-16).[1]

On January 7, 2009, officers of the Las Vegas Metropolitan Police Department (Metro) went to the Red Rock Casino in Las Vegas, where security had detained two women suspected of trying to cash a fraudulent check.  One woman told officers that petitioner was planning to rob an armored car when it stopped at the Timbers bar at the intersection of Cheyenne Avenue and Fort Apache Road in Las Vegas.  The reporting officer later learned that petitioner matched the description that the woman gave, and that he was on parole or probation.  The officer also learned that a coin truck was scheduled to stop at Timbers on Thursdays, between 10:00 a.m. and 12:00 Noon.  Because this was consistent with the information that the woman gave, Metro arranged surveillance of Timbers on January 8, 2009.  Ex. 120 (ECF No. 70-3, at 115-17).

Parole and Probation officer Adriana Lindquist testified at trial that on January 8, 2009, petitioner's residence was 9421 Shellfish Court, near the intersection of Desert Inn Road and Fort Apache Road in Las Vegas.  Ex. 30, at 141-42 (ECF No. 63-1, at 142-43).  Joan Arnbrister[2] owned the house.  Her daughter, Donna Hayborn, lived with her.

Lindquist gave voir dire testimony outside of the presence of the jury.  On the morning of January 8, 2009, petitioner's former parole officer received a fax from petitioner stating that his address had changed from 5127 Sparkling Vine, Las Vegas, to 9421 Shellfish Court.  Ex. 30, at 134 (ECF No. 63-1, at 135).  That same morning, before petitioner's former parole officer gave Lindquist the address-change fax, a Metro detective called Lindquist asking for information about petitioner because petitioner might have been planning a robbery.  Lindquist, who had recently been assigned petitioner's case, said that she could not provide much information.  Id. at 136 (ECF No. 63-1, at 137).  After that phone call, petitioner's former parole officer gave Lindquist the fax.  Id. at 137 (ECF No. 63-1, at 138).  Lindquist and the Metro detective spoke again, and

---

[1] The identification of petitioner as the robber of both stores came later.
[2] Her name is spelled many different ways in the trial transcripts and other documents.

| | |
|---|---|
| 1 | she told the detective about the change in address. Id. at 138 (ECF No. 63-1, at 139). Based on |
| 2 | the information that the detective gave Lindquist, she assembled other parole officers, with Metro |
| 3 | officers in support, to search petitioner's new residence. Id. at 135 (ECF No. 63-1, at 136). |
| 4 | Lindquist herself did not go on the search. Id. |

Metro apparently set up surveillance and two Timbers locations close to each other. One was at 9180 West Cheyenne Avenue, at the intersection of Fort Apache road. The other was at 3370 Novat Street, about two miles to the west, near the interchange of West Cheyenne Avenue and Clark County 215.[3] ECF No. 72, at 81. An entry at 11:02 states, "Drop been made, surv poss ending shortly." An entry at 11:11 a.m. states, "Per car to car drop will be done in 15 mins, will come out 1 at a time." Id. The last entry in the dispatch log is at 11:23 a.m. Id.

Around the same time, parole officers and Metro officers assembled to check on 9421 Shellfish Court. Parole officers knocked on the front door, but nobody answered it. Parole officer Jason Buratczuk went around the back of the house. Ex. 30, at 144 (ECF No. 63-1, at 145). He saw petitioner through a window. Id. Buratczuk entered the house. Id. He asked petitioner where his bedroom was. Id. Petitioner indicated the sole bedroom on the first floor. Id. Buratczuk went there and found a pistol underneath the bed's mattress. Id. at 145-46 (ECF No. 63-1, at 146-47). Buratczuk then handed the matter over to the police. Id. at 146 (ECF No. 63-1, at 147).

Metro officer Justin Zinger secured the house. Ex. 30, at 165 (ECF No. 63-1, at 166). Then he obtained a telephonic search warrant. Id. at 165-66 (ECF No. 63-1, at 166-67). In the first-floor bedroom, he saw photographs of petitioner and Hayborn hanging on the wall. Id. 168-70 (ECF No. 63-1, at 169-71). He located the gun that parole officer Buratczuk had found. Id. at 170 (ECF No. 63-1, at 171). Metro officer Thomas Farris also searched the first-floor bedroom. He found petitioner's wallet on a desk. Id. at 158 (ECF No. 63-1, at 159). Officer Zinger found some of the jewelry stolen from the Sorrell Sky Gallery and items stolen from the Rabbit Hole. Id. at 172- 174-75 (ECF No. 63-1, at 173, 175-76).

---

[3] http://timbersgaming.com/locations.html (report generated September 28, 2019).

3

When Metro officers learned that the jewelry had been stolen from Durango, Metro detective Chris Boddie communicated with Durango detectives Peter Berryhill and Robert Brammer. Boddie sent them photographs of petitioner. Ex. 30, at 179 (ECF No. 63-1, at 180).

Huffman did two photographic lineups. In the first lineup, petitioner's photograph was not included, and Huffman did not identify anyone. In the second lineup, petitioner's photograph was included, and she identified petitioner as the robber of the Sorrel Sky Gallery. Ex. 30, at 60 (ECF No. 63-1, at 61. Bannatyne did one photographic lineup. She identified Richard Price as the robber. At trial, she identified petitioner as the robber. However, she insisted that petitioner was the person she selected in the photographic lineup. Ex. 30, at 115-18 (ECF No. 63-1, at 116-19).

Petitioner's relation of the facts differs considerably. The court reproduces it in full:

> Petitioner's residence was 5127 Sparkling Vine, Las Vegas "(Sparkling Vine") until he was arrested. This address was verified by Department of Public Safety, Division of Parole & Probation ("P&P") in November 2008, was seen by Officer Gilbert at this residence on December 3, 2008 (Ex. 3, pg. 4), water utility bills (ECF 72, Ex. 14), and Sparkling Vine was listed as his residence in Scope (ECF 23, Ex. X). Petitioner never sent a fax to P&P changing his address to 9421 Shellfish, Las Vegas, Nevada ("Shellfish") (see Ex. 2). P&P rules on change of address are clear, in that you had to receive prior authorization from your parole officer before changing your address (NAC 213.620(b)), Petitioner knew this, and this was testified to by Officer Buratczuk in the first day of Petitioner's Federal trial (ECF 82, pg. 204).
>
> Petitioner spent the night at Hayborn's residence and left Shellfish some time between 5 am and 6 am on January 8, 2009 in his white Chevy Tahoe. At the time of his arrest on January 8, 2009, Petitioner had not registered the vehicle (Tahoe) in his name, though the title and bill of sale were in the console of the vehicle on that date.
>
> While driving down Desert Inn Road, just after he passed Fort Apache (the "Intersection"), his vehicle was "cornered" (front, back, and driver's side) by three unmarked vehicles, two cars and a Dodge truck.
>
> Per dispatch records at 10:52 am: police ran license plate of the white Chevy Tahoe; Petitioner was stopped by LVMPD ROP officers at this time; DMV records showed registered owner of the white Chevy Tahoe was Jeffrey Merrill.
>
> Two men exited the vehicles (5 to 6 men total in the 3 vehicles), both wearing ski masks, in plain clothes (no hang badges identifying them as police) with assault rifles drawn and pointing at Petitioner. The police officer on the driver's side had the assault rifle pointed at his head. Petitioner was taken out of his truck and placed into a vehicle (which he remembers to be a Chrysler 300 or something similar). A man was in the driver's seat (assumed to be another officer, no identifying clothing or other item) and the second officer got in on the passenger side front seat and held the assault rifle close to Petitioner's face (distance between front passenger seat and back seat).

4

> Dispatch records shows at 11:11 am: "per car to car drop will be done in 15 mins., will come out 1 at a time").
>
> LVMPD ROP officers took Petitioner to Shellfish (approximately 2 blocks from the Intersection), took him in the backyard at gunpoint, and he was ordered to lay face down on the back patio. After approximately 10 minutes, he was placed into a chair. An officer brought Petitioner's wallet and the $2,469 in cash he had in his vehicle to him (officer placed these items in a plastic bag) and set the bag down between his feet. Petitioner heard officers stating that they needed to get him out of there so they could work the girl. (He believes he was at Shellfish for approximately 20 minutes total).
>
> Petitioner was taken by Officer Raymond and another officer to an area behind Walgreen's (at the Intersection). Petitioner was placed into another unmarked vehicle and taken to CCDC and booked on a parole violation at 1200 hours.
>
> Temporary Custody Records shows Petitioner arrived at CCDC at 1200 hours and was officially booked at 1341 hours (ECF 72, Ex. 20).
>
> While being booked by Officer Raymond, Officer Raymond took Petitioner's wallet and cash and told Petitioner's it was parole evidence (when asked by Petitioner why he was not giving his property to property officer). Petitioner's wallet was planted at Shellfish on the desk in Hayborn's room (Ex. 4).
>
> Petitioner was not the robber of either the Sorrel Sky Gallery nor the Rabbit Hole as alleged by Respondent. In fact, those charges have been dismissed by the State of Colorado (Ex. 5).

ECF No. 113, at 6-8. This is not petitioner's only explanation of what happened. The finding of the pistol led to a federal criminal case in this court. United States v. Combs, Case No. 2:10-cr-00173-KJD-RJJ. In that case, he argued in proper-person filings that the government's facts all were false because he was arrested on January 7, 2009, and thus he was in custody on January 8, 2009, when all this supposedly happened. Id., ECF No. 44.

In the case at issue, petitioner was convicted in state courts of 21 counts of possession of stolen property. Ex. 45 (ECF No. 64-15). Petitioner's direct appeal and post-conviction habeas corpus petition were unsuccessful.

This court dismissed ground 5 of the amended petition (ECF No. 23) because it was a claim of a violation of the Fourth Amendment, and petitioner received a full and fair opportunity to litigate the claim in state court. ECF No. 87. Reasonable jurists would not find the court's conclusion to be debatable or wrong, and the court will not issue a certificate of appealability for ground 5.

The court also found that petitioner had not exhausted most of his grounds for relief. ECF No. 87. The court dismissed those grounds. ECF No. 103. Reasonable jurists would not find the court's conclusion to be debatable or wrong, and the court will not issue a certificate of appealability for ground 5.

The remaining grounds of the amended petition are 1.2, 1.3, 1.15, 7, and 8.

## II. The Court Denies the Motions for Discovery and for an Evidentiary Hearing

Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts states, "A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." If, through "specific allegations before the court," the petitioner can "'show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry.'" Bracy v. Gramley, 520 U.S. 899, 908-09 (1997) (quoting Harris v. Nelson, 394 U.S. 286, 300 (1969)).

28 U.S.C. § 2254(e) places limits on this court holding an evidentiary hearing:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
>
> (A) the claim relies on--
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Petitioner seeks discovery, an evidentiary hearing, and expansion of the record, to prove the following:

> (1) Petitioner was not at the Shellfish residence as was testified to by Respondent's witnesses; (2) Petitioner was arrested at the Intersection; (3) that petitioner was not in possession of any firearm at the time of his arrest and not in violation of his parole; (4) that petitioner was in custody at CCDC prior to the service of the search warrant at Shellfish; (5) the State had no probable cause or reasonable suspicion to arrest Petitioner for the false tip that Petitioner was planning the robbery of a coin truck at Timber on January 8, 2009 because that tip was false; and (6) that Officer

> Zinger lied throughout the court proceedings, in the state case and federal case, in his reports, the telephonic search warrant about who the tipster was, the gun, Petitioner's residence, and falsified his reports stating the tipster said the stolen property was at Shellfish and the tipster smoked meth with Hayborn; and (7) that Colorado witnesses Hewett and Bannatyne lied about their identification of petitioner as their assailant because they were told to identify Petitioner.

ECF No. 113, at 8-9.

On the fax notifying Parole and Probation of the change of address, respondents point to the transcript of petitioner's preliminary hearing in the firearm case, when it still was in state court. Donna Hayborn testified on cross-examination by petitioner's lawyer, "I wrote a statement with a change of address, telephone number where he would be staying--where Brett would you be staying and walked into the parole and probation office the Friday before the police came, that would be the 7th."[4] Ex. 1 to Opposition, at 35 (ECF No. 120-1, at 10). Petitioner's lawyer showed Hayborn the document. Hayborn testified that she typed it and dated it, and that petitioner signed it. Id., at 35-36 (ECF No. 120-1, at 10). Petitioner claims that Hayborn was lying and trying to protect herself from criminal charges. ECF No. 122, at 6. He also notes that the prosecution's theory in this case was that Parole and Probation received a fax at 8:16 a.m. on January 8, 2009, not that Hayborn hand-delivered the statement on January 7, 2009. Nonetheless, somebody sent something to Parole and Probation informing them that petitioner was residing at 9421 Shellfish Court. Otherwise, Parole and Probation had no reason to know the significance of that residence. Ultimately, the notification, whatever it's form, is what led parole officers and Metro officers to the house.

Petitioner's argument that police officers seized him in a three-car blocking maneuver close to the intersection of Desert Inn Road and Ft. Apache Road has no support in the documents. The dispatch log for 9421 Shellfish Court shows that police officers checked the license plate of a white Chevrolet Tahoe, Nevada license plate LVCC64.[5] At 10:52 a.m., dispatch

---

[4] January 7, 2009 was a Wednesday.

[5] In the email communication between Metro detective Boddie and Durango detective Berryhill, Berryhill learned that petitioner had stayed in a motel and had listed a Tahoe, Nevada license CC64. Ex. 114 (ECF No. 69-2, at 29-30). Boddie wrote back, "Pete, we towed that Chevy Tahoe. It doesn't belong to Combs but it was parked outside his house the day of the warrant. None of the VINs matched so we towed it for a VIN verification." Id. (ECF No. 69-2, at 32) (emphasis added).

7

notified police that Jeffrey Merrill Abbott was the registered owner. ECF No. 72, at 82. The code of 440 meant that Abbott was a wanted suspect.[6] Dispatch also stated that Abbott was wanted held without bail for county charges of felony grand larceny. At the time, Abbott was facing charges for felony grand larceny of an automobile, and the state district court had issued a bench warrant for his arrest. State v. Abbott, Case No. 08C246592.[7] The 7-digit Metro identification number given must have been Abbott's, because it was not petitioner's. Petitioner's Metro identification number was 1799394. Ex. 1 (ECF No. 61-1, at 6). Everything in these entries refers to Abbott, not petitioner. Nothing in those entries indicates that petitioner was in the Tahoe, or that police stopped the Tahoe while petitioner was driving it near the intersection of Desert Inn Road and Fort Apache Road.[8]

Petitioner also takes another dispatch log out of context. The entry at 11:11 am, "Per car to car drop will be done in 15 mins., will come out 1 at a time," is on the dispatch log for the surveillance of Timbers. It does not describe events at or near 9421 Shellfish Court.

Given that petitioner's argument that he was arrested at some place are based upon an incorrect interpretation of an entry in one dispatch log and trying to mix in another entry from another event's dispatch log, he has not demonstrated the need for discovery or an evidentiary hearing on the first three items on his list.

Regarding the fourth item, discovery is not necessary because the documents in the record already show that petitioner was at the Clark County Detention Center before the search warrant was served. The temporary custody record shows that petitioner was booked into the Clark County Detention Center at 1:41 p.m. on January 8, 2009. ECF No. 72, at 97. The police requested the telephonic search warrant at 2:25 p.m. the same day. ECF No. 23-2, at 46.

---

[6] https://www.lvmpd.com/en-us/ProtectTheCity/Documents/IDF%20Code%20Card.pdf (report generated September 27, 2019). The code 440 on the line means wanted suspect.

[7] https://www.clarkcountycourts.us/Portal/Home/Dashboard/29 (report generated September 27, 2019). The case number must be entered exactly on the search line.

[8] The top of the dispatch log states an address of West Desert Inn Road and South Fort Apache Road. ECF No. 72, at 82. However, the entries show police officers assembling at the intersection of Grand Canyon Drive and Pioneer Avenue, then proceeding from Desert Inn and Grand Canyon toward Desert Inn and Fort Apache, and then arriving at 9421 Shellfish Court, which is a couple of blocks from Desert Inn and Fort Apache. The significance of Desert Inn and Fort Apache in the dispatch log is nothing more than the intersection of two major cross streets nearest to all the events.

8

1  Furthermore, Zinger did not testify that he served the search warrant upon petitioner at 9421
2  Shellfish Court. See Ex. 30, at 162-92 (ECF No. 63-1, at 163-93).

3  Petitioner's fifth item is irrelevant to the case. Petitioner was not arrested on suspicion of
4  planning to rob a coin truck at Timbers. To the best of this court's knowledge, petitioner never
5  has been charged with anything involving Timbers. Petitioner was arrested first for a parole
6  violation, being in possession of a firearm, and later for possession of stolen property and being
7  an ex-felon in possession of a firearm. As for the allegation that the police knew that the tip was
8  false, the court disposes of that in its discussion of ground 1.3 below.

9  Petitioner's sixth item is the result of combining two documents together and then
10 confusing the people involved. The first document is the report of the tip that petitioner planned
11 to rob Timbers. For the purpose of the sixth item, the person who gave the tip stated three
12 relevant things. First, petitioner lived near the intersection of Bradley Road and Brent Lane. Ex.
13 120 (ECF No. 70-3, at 116). Petitioner's registered address, 5127 Sparkling Vine, is near that
14 intersection. Second, petitioner lived with a woman named Diedre D'Amore, who often smoked
15 methamphetamine and told the informant about petitioner's crimes while under the influence of
16 methamphetamine. Id. Third, petitioner and D'Amore had 3 storage facilities in town where
17 petitioner kept stolen property. Id. The informant did not say anything about 9421 Shellfish
18 Court or Donna Hayborn. The second document is police officer Justin Zinger's declarations in
19 support of obtaining a telephonic search warrant. Zinger said that Donna Hayborn told him that
20 petitioner had moved stolen property, firearms, and ammunition into a storage facility. Zinger did
21 not identify, correctly or incorrectly, the person who gave the tip about the possible Timbers
22 robbery. Zinger did not state that the informant had said that the property was at 9421 Shellfish
23 Court. Zinger did not state that the informant had said that she had smoked methamphetamine
24 with Donna Hayborn. Neither discovery nor an evidentiary hearing will help petitioner prove his
25 sixth item, because the sixth item is based upon facts that do not exist.

26 Petitioner provides no support at all for his seventh item, that the Durango robbery victims
27 were told to identify petitioner. They identified petitioner at trial and were subject to cross-
28 examination.

In conclusion, petitioner's arguments are based upon misinterpretations, mixtures of different documents, and taking documents out of context. In some instances, petitioner actually has the documents for which he seeks discovery. Petitioner thus has given the court no reason to believe that discovery or an evidentiary hearing would develop facts that would show that he is entitled to relief. See Bracy v. Gramley, 520 U.S. 899, 908-09. See also 28 U.S.C. § 2254(e)(2)(B).[9]

## III. The Court Denies the Amended Petition

### A. Standard of Review

Congress has limited the circumstances in which a federal court can grant relief to a petitioner who is in custody pursuant to a judgment of conviction of a state court.

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." Harrington v. Richter, 562 U.S. 86, 98 (2011).

> Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of this Court, § 2254(d)(1); Williams v. Taylor, 529 U.S. 362, 412 (2000); or that it "involved an unreasonable application of" such law, § 2254(d)(1); or that it "was based on an unreasonable determination of the facts" in light of the record before the state court, § 2254(d)(2).

---

[9] The court finds that § 2254(e)(2) applies because petitioner failed to develop the facts in the state court. Petitioner had three opportunities in the state-court case to develop the facts: The motion to suppress, the trial itself, and the post-conviction habeas corpus petition. Additionally, although petitioner's federal criminal case is not within the scope of § 2254(e)(2), petitioner had three opportunities in United States v. Combs to develop the facts: The motion to suppress, the trial itself, and the motion under 28 U.S.C. § 2255. Petitioner alleges in this action that trial counsel and state post-conviction counsel were ineffective because they did not raise his version of facts in state court. To that, petitioner would have to add the Federal Public Defender and every CJA counsel who represented him in federal court. Many attorneys would have needed to be ineffective in the exact same way.

Richter, 562 U.S. at 100. "For purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Id. (citation omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. (citation omitted).

> [E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

> Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.

Richter, 562 U.S. at 102.

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 103.

**B.  Petitioner Has Not Demonstrated that the State-Court Factual Findings Are Unreasonable**

In all remaining grounds, petitioner contests the facts that support the state-court decisions. The court rejects his arguments for the same reasons why the court has rejected his motions for discovery and for an evidentiary hearing. Petitioner bases his arguments on taking documents out of context and then misinterpreting those arguments. Petitioner gives the court no reason to believe that the state courts have made findings of fact based upon unreasonable interpretations of the evidence presented. See 28 U.S.C. § 2254(d)(2).

**C.  Ground 1 Is Without Merit**

**1.  Standard of Review for Claims of Ineffective Assistance of Counsel**

The remaining claims in ground 1 are claims of ineffective assistance of trial counsel. "[T]he right to counsel is the right to the effective assistance of counsel." McMann v.

Richardson, 397 U.S. 759, 771 & n.14 (1970).  A petitioner claiming ineffective assistance of counsel must demonstrate (1) that the defense attorney's representation "fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694.  "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."  Id. at 697.

Strickland expressly declines to articulate specific guidelines for attorney performance beyond generalized duties, including the duty of loyalty, the duty to avoid conflicts of interest, the duty to advocate the defendant's cause, and the duty to communicate with the client over the course of the prosecution.  466 U.S. at 688.  The Court avoided defining defense counsel's duties so exhaustively as to give rise to a "checklist for judicial evaluation of attorney performance. . . . Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions."  Id. at 688-89.

Review of an attorney's performance must be "highly deferential," and must adopt counsel's perspective at the time of the challenged conduct to avoid the "distorting effects of hindsight."  Strickland, 466 U.S. at 689.  A reviewing court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Id. (citation omitted).

The Sixth Amendment does not guarantee effective counsel per se, but rather a fair proceeding with a reliable outcome.  See Strickland, 466 U.S. at 691-92.  See also Jennings v. Woodford, 290 F.3d 1006, 1012 (9th Cir. 2002).  Consequently, a demonstration that counsel fell below an objective standard of reasonableness alone is insufficient to warrant a finding of ineffective assistance.  The petitioner must also show that the attorney's sub-par performance prejudiced the defense.  Strickland, 466 U.S. at 691-92.  There must be a reasonable probability that, but for the attorney's challenged conduct, the result of the proceeding in question would

have been different. Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," . . . and when the two apply in tandem, review is "doubly" so . . . . The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Harrington v. Richter, 562 U.S. 86, 105 (2011) (citations omitted).

**2.   Ground 1.2 Is Without Merit**

In ground 1.2, petitioner alleges, "During my motion to suppress and trial proceedings the Division of Parole and Probation were committing blatant perjury about a fax the attorney Martin Hart refused to bring to the courts attention that no such fax exist." On this issue, the Nevada Supreme Court held:

> Second, Combs argues his trial counsel was ineffective for raising a poor argument in his motion to suppress. Combs argues counsel should have asserted the evidence discovered in the search was not properly recovered because Combs was merely an overnight guest and not a resident of the home. Combs fails to demonstrate counsel's performance was deficient for resulting prejudice. At the evidentiary hearing, counsel testified he had reviewed the facts and argued the search was an improper warrantless-investigatory search because he felt that argument had the greatest likelihood of success. Tactical decisions such as this one "are virtually unchallengeable absent extraordinary circumstances," Ford v. State, 105 Nev. 850, 853, 784 P.2d 951, 953 (1989), which Combs does not demonstrate. Moreover the evidence demonstrated Combs had notified his probation officer that he resided at the residence where the stolen property was discovered, Combs indicated to the officers conducting the search the bedroom containing the stolen items was his, and his wallet containing his identification was discovered in the bedroom. Accordingly, Combs fails to demonstrate a reasonable probability of a different outcome had counsel attempted to argue Combs was merely an overnight guest at that home. Therefore, the district court did not err in denying this claim.

Ex. 141, at 3 (ECF No. 71-14, at 4). The trial court heard argument on the motion to suppress on the first day of trial. The following exchange occurred:

> MS. NYIKOS [prosecutor]: Well, and here it is. I mean, he--the defendant sent in the change of address the same day that Metro was calling. I mean, so--which is the Shellfish address. And that's what was testified to at the preliminary hearing [in the firearm case].

13

> MR. HART [defense counsel]: And that was a typed deal. I don't know what exactly it was sent, because that wasn't laid out in the hearing in the other case. It was--
>
> MS. NYIKOS: Right.
>
> MR. HART: --kind of nebulous--it was nebulous. Let's put it--I mean, let's call it what it was. It was, yeah, we had some paperwork later, but it doesn't say when they got that paperwork from. I can see it now--
>
> MS. NYIKOS: Well, let's think about this logically. I don't know how P&P can get to that address to do a home visit if they don't know what the address is. So, I mean . . .
>
> MR. HART: Well--
>
> MR. RADOVCIC: Your client's certainly not going to send in a fax after they show up at his house saying what his new address is.

Ex. 27, at 5-6 (ECF No. 62-1, at 6-7). Thus, at the hearing on the motion to suppress, trial counsel did call into question the existence of the change of address fax. The problem with the argument, as the prosecutors pointed out at the hearing and as this court has noted previously, is that somebody had to notify Parole and Probation that petitioner was living at 9421 Shellfish Court. Otherwise, Parole and Probation had no way of knowing that petitioner was living there. As for raising the issue at trial, trial counsel would have good reason not to do that. It would have let the jury know that petitioner was on parole, and trial counsel was trying not to let the jury learn that information.[10] The Nevada Supreme Court applied Strickland reasonably in denying this claim.

### 3. Ground 1.3 Is Without Merit

In ground 1.3, petitioner alleges:

> During motion to suppress hearing and trial proceedings police officers were continually lying about a supposed armed car robbery that they said was supposed to happen. Martin Hart refused to submit evidence such as dispatch where the officers stated on tape there was never going to be any armed car robbery and through out all court proceedings he knowingly let metro pd and department of public safety lie to my judges and jury.

ECF No. 23, at 3. On this issue, the Nevada Supreme Court held:

---

[10] For example, at trial the Parole and Probation officers wore their uniforms. Everyone involved tried to make sure that the jury could not read their badges or shoulder patches. The court also told everyone to refer to the witnesses as officers with the Nevada Department of Public Safety. Ex. 30, at 130-32 (ECF No. 63-1, at 131-33).

14

> Fourth, Combs argues his trial counsel was ineffective for informing the jury
> during closing argument the police had received an anonymous tip regarding
> Combs' involvement in planning a robbery. At the evidentiary hearing, counsel
> testified he believed he needed to explain to the jury the background for what had
> occurred. Tactical decisions such as this one "are virtually unchallengeable absent
> extraordinary circumstances," Ford, 105 Nev. at 853, 784 P.2d at 953, which
> Combs does not demonstrate. Given the substantial evidence of Combs' guilt
> produced at trial, Combs fails to demonstrate a reasonable probability of a
> different outcome had counsel declined to discuss the anonymous tip or Combs'
> possible involvement in planning a robbery. Therefore, the district court did not
> err in denying this claim.

Ex. 141, at 4 (ECF No. 71-14, at 5). As petitioner characterizes the claim now, it is without factual support and without merit. The informant told police that petitioner was planning to rob Timbers. The police determined that the tip was credible after they confirmed with Timbers about the time and procedures of coin-truck stops. During the surveillance, an entry at 11:02 a.m. states, "Drop been made, surv poss ending shortly." An entry at 11:11 a.m. states, "Per car to car drop will be done in 15 mins, will come out 1 at a time."[11] Contrary to petitioner's allegations, the police did not say on the dispatch log that they knew that the robbery would not occur. Instead, they were saying that the coin truck had made its stops and that they would end the surveillance soon. Counsel did not perform deficiently by not introducing these log entries, and petitioner suffered no prejudice from the entries not being introduced.

**4.      Ground 1.15 Is Without Merit**

In ground 1.15, petitioner alleges:

> Martin Hart knowingly allowed prosecutors to switch Brett Combs photograph
> with that of Richard Price after Witness Julian Huffman 100% identified him as
> the man that robbed her and he told me this was better because the photographic
> lineup was bias and unconstitutional and he let witness commit perjury knowing I
> was not the man she identified he told me if he helped the prosecutor she would
> help him she didn't want to look like a fool for getting a bad acts motion granted
> by stating witness identified me as the robber when the witness identified
> somebody else.

ECF No. 23, at 5. On this issue, the Nevada Supreme Court held:

> Third, Combs argues his trial counsel was ineffective for failing to assert the photo
> line-up was suggestive and lacked credibility. Combs fails to demonstrate his
> counsel's performance was deficient or resulting prejudice. Combs cannot
> demonstrate deficiency for this claim because counsel argued the photo line-up

---
[11] As noted above, it appears that Metro officers were observing two Timbers locations, hence the seemingly repetitive entries.

> was suggestive and lacked credibility. Moreover, this court considers the totality of the circumstances to determine whether the photo line-up procedure was "'so unduly prejudicial as to fatally taint [the defendant's] conviction.'" Cunningham v. State, 113 Nev. 897, 904, 944 P.2d 261, 265 (1997) (alteration in original) (quoting Simmons v. United States, 390 U.S. 377, 383 (1968)). Here, there was substantial evidence of Combs' guilt produced at trial because he was identified by two victims of the Colorado robberies and the items taken from those robberies were discovered in Combs' bedroom. Accordingly, Combs fails to demonstrate a reasonable probability of a different outcome had counsel further challenged the photo line-ups. Therefore, the district court did not err in denying this claim.

Ex. 141, at 4 (ECF No. 71-14, at 5). Respondents' summary of what happened at trial on this issue is accurate. Julia Huffman, the gallery employee, identified petitioner as the person who robbed the gallery. Ex. 30, at 52-53 (ECF No. 63-1, at 53-54). Huffman also identified petitioner in a photographic lineup. Id. at 59 (ECF No. 63-1, at 60). Durango detective Brammer, who set up the photographic lineup, confirmed that Huffman identified petitioner. Id. at 93-94 (ECF No. 63-1, at 94-95). In an earlier lineup, Huffman did not identify anyone, but petitioner's photograph was not in that lineup. Id. at 100 (ECF No. 63-1, at 101). Margaret Bannatyne, the smoke shop owner, identified Price, with 80% certainty, in a photographic lineup that did not include petitioner's photograph. Id. at 108, 110, 115-16 (ECF No. 63-1, at 109, 111, 116-17). Counsel did point this discrepancy to the jury. Id. at 117 (ECF No. 63-1, at 118). Ex. 35, at 16-17 (ECF No. 64-5, at 17-18). Durango detective Berryhill, who assembled the photographic lineup, also noted this, both on direct examination and cross examination. Ex. 30, at 121-23, 124-25 (ECF No. 63-1, at 122-24, 125-26). Finally, the prosecution noted the discrepancy in the closing argument. Ex. 35, at 6 (ECF No. 64-5, at 7).

Petitioner's claim has mixed the testimonies of two witnesses. Once those testimonies are separated, it is clear that trial counsel did what petitioner claims trial counsel should have done. Furthermore, petitioner identified as his the bedroom where the stolen items were found. His pictures were on the wall. His wallet was in the bedroom. As the Nevada Supreme Court noted, plenty of evidence of petitioner's guilt existed.

**D.     Ground 7 Is Without Merit**

Ground 7 is a claim that the admission evidence of prior bad actions, which were the robberies in Durango, violated the Constitution. On this issue, the Nevada Supreme Court held:

> We review the district court's decision to admit evidence of other bad acts for an abuse of discretion and will not reverse that decision absent manifest error. Ledbetter v. State, 122 Nev. 252, 259, 129 P.3d 671, 676 (2006). Here, the district court conducted a hearing pursuant to Petrocelli v. State, 101 Nev. 46, 51-52, 692 P.2d 503, 507-08 (1985), modified on other grounds by Sonner v. State, 112 Nev. 1328, 1334, 930 P.2d 707, 711-12 (1996), found that the factors for determining admissibility of bad acts evidence were met, see Tinch v. State, 113 Nev. 1170, 1176, 946 P.2d 1061, 1064-65 (1997), and ruled that the bad acts evidence was admissible to show knowledge, see NRS 48.045(2). We conclude that the district court's decision to admit the other bad acts evidence did not constitute manifest error.

Ex. 52, at 1-2 (ECF No. 64-22, at 2-3). The Nevada Supreme Court's decision cannot be contrary to, or an unreasonable application of clearly-established federal law as determined by the Supreme Court of the United States because no such clearly-established federal law exists on this issue. Alberni v. McDaniel, 458 F.3d 860, 867 (9th Cir. 2006). See also Carey v. Musladin, 549 U.S. 70, 77 (2006). Ground 7 is without merit.

**E.     Ground 8 Is Without Merit**

Ground 8 is a claim that the evidence was insufficient to sustain the verdict of guilty on all charges. "The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 309 (1979) (citing In re Winship, 397 U.S. 358 (1970)). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319 (emphasis in original). "[T]he standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Id. at 324 n.16.

At the time, the law regarding stolen property stated, in relevant part:

> 1.     A person commits an offense involving stolen property if the person, for his or her own gain or to prevent the owner from again possessing the owner's property, buys, receives, possesses or withholds property:
>
> (a)     Knowing that it is stolen property; or
>
> (b)     Under such circumstances as should have caused a reasonable person to know that it is stolen property.
>
> 2.     A person who commits an offense involving stolen property in violation of subsection 1:
>
> [. . .]

17

> (c) If the value of the property is $2,500 or more or if the property is a firearm, is guilty of a category B felony and shall be punished by imprisonment in the state prison for a minimum term of not less than 1 year and a maximum term of not more than 10 years, and by a fine of not more than $10,000.

Nev. Rev. Stat. § 205.275 (1999). On this issue, the Nevada Supreme Court held:

> The jury heard testimony that Combs notified his parole and probation officer of his new address. When officers went to that address to conduct a search, Combs indicated which bedroom was his. In that bedroom, officers found Combs' wallet and identification and photographs of him and his girlfriend. The officers also found jewelry, various glass smoking pipes, and digital scales in the closet and bathroom attached to the bedroom. The jury also heard testimony that Combs robbed two stores in Colorado. The victims of those robberies identified Combs as the robber and identified the jewelry, glass pipes, and digital scales as merchandise taken from the stores.
>
> Based on this testimony, we conclude that a rational juror could reasonably infer that Combs had possession or constructive possession of merchandise that he knew or had reason to know was stolen. See NRS 205.275(1). It is for the jury to determine the weight and credibility to give conflicting testimony, and the jury's verdict will not be disturbed on appeal where, as here, substantial evidence supports the verdict. Bolden v. State, 97 Nev. 71, 73, 644 P.2d 20, 20 (1981).

Ex. 52, at 3 (ECF No. 64-22, at 4). Based upon the facts recited at the beginning of this order, the court concludes that the Nevada Supreme Court reasonably concluded that the evidence was sufficient to support the verdict.

**IV.      The Court Will Not Issue a Certificate of Appealability**

To appeal the denial of a petition for a writ of habeas corpus, Petitioner must obtain a certificate of appealability, after making a "substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c).

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

Slack v. McDaniel, 529 U.S. 473, 484 (2000); see also James v. Giles, 221 F.3d 1074, 1077-79 (9th Cir. 2000).

In grounds 1.2 and 1.15, trial counsel did what petitioner claims he should have done. Reasonable jurists would not disagree with those decisions. In ground 1.3, as it is alleged in this court, petitioner's allegation that the police knew ahead of time that the robbery of Timbers would

18

not occur are without factual support. Reasonable jurists would not disagree with that decision. Regarding ground 7, the court held that no clearly established federal law exists on the admission of prior bad acts. Reasonable jurists would not disagree with that decision. Finally, regarding ground 8, the court held that the Nevada Supreme Court's determination that the evidence was sufficient was itself reasonable. Given the amount of evidence of petitioner's guilt in possessing stolen property, the court finds that reasonable jurists would not disagree with that decision. The court thus will not issue a certificate of appealability.

**V.    Conclusion**

IT THEREFORE IS ORDERED that petitioner's motion to conduct discovery and allow expansion of the record (ECF No. 113) is **DENIED**.

IT FURTHER IS ORDERED that petitioner's motion for evidentiary hearing (ECF No. 114) is **DENIED**.

IT FURTHER IS ORDERED that the amended petition for a writ of habeas corpus (ECF No. 23) is **DENIED**. The clerk of the court shall enter judgment accordingly and close this action.

IT FURTHER IS ORDERED that a certificate of appealability will not issue.

DATED: September 30, 2019

GLORIA M. NAVARRO
United States District Judge